# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael J. Anderson,                    Civil No. 09-2091 (JRT/SRN)

       Plaintiff,

v.                                      **REPORT AND**
                                        **RECOMMENDATION**
Michael J. Astrue, Commissioner
of Social Security,

       Defendant.

---

Edward C. Olson, Esq., Attorney at Law, 331 2nd Avenue South, Suite 420, Minneapolis, Minnesota 55401, for Plaintiff.

Lonnie F. Bryan, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Michael J. Anderson seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner), who denied Plaintiff's application for disability insurance benefits (DIB). Both parties have filed motions for summary judgment (Docket Nos. 13 and 16) and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and the District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion (Docket No. 13) be denied and Defendant's motion (Docket No. 16) be granted.

# I.     BACKGROUND

## A.        PROCEDURAL HISTORY

Plaintiff filed an application for DIB on April 14, 2006. (Tr. 92–94.) He alleged a disability onset date of November 9, 2004, due to respiratory irritation, fatigue, and shortness of breath. (Tr. 92–94.) The agency denied his application on initial review and reconsideration. (Tr. 63–65, 70–71.) Plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ). (Tr. 74.) On June 25, 2008, ALJ Roger W. Thomas held a hearing on Plaintiff's eligibility for DIB, and on November 14, 2008, ALJ Thomas issued an unfavorable decision. (Tr. 13, 24.) The Appeals Council denied Plaintiff's request for review on June 10, 2009. (Tr. 1–4.) The denial of review made the ALJ's decision the final decision of the Commissioner and subject to judicial review. See 42 U.S.C. § 405(g); Clay v. Barnhart, 417 F.3d 922, 928 (8th Cir. 2005).

## B.        FACTUAL BACKGROUND

Plaintiff was born on April 3, 1974, making him 34 years old at the time of the ALJ's decision. (Tr. 23, 92.) Plaintiff has never been married and he is the custodial parent of his son. (Tr. 30, 245.) Plaintiff attended Cotton High School, but broke his vertebrae during his senior year and was unable to graduate. (Id.) Plaintiff obtained his Graduate Equivalency Diploma (GED) in 1994. (Id., Tr. 121–122.)

Plaintiff has past relevant work experience as a bartender, bouncer, cashier, light auto mechanic, car detailer, equipment operator, and counter sales clerk. (Tr. 256, 437.) Plaintiff has also volunteered for the Central Lakes Fire Department. (Tr. 246.) Plaintiff worked at Second Auto Repair Shop as a mechanic where he maintained a fleet of 15-25 rental cars and prepared the automobiles for sale.  (Tr. 245, 279.) He earned approximately $10 per hour. (Tr. 245.) On November 10, 2004, while working at Second Auto Repair Shop, Plaintiff was exposed to a high

concentration of aerosolized paint and a product known as clear coat. (<u>Id.</u>, Tr. 286.) Other co-workers were in the area at the time of the exposure, but they were all wearing respiratory protection and have suffered no ill effects. (Tr. 286.)

The evening of the exposure, Plaintiff went home and noted significant burning in his eyes, throat, and nose as well as chest pain and cough. (<u>Id.</u>) Plaintiff returned to work on November 11, 2004, and was further exposed to the vapors that caused his respiratory irritation. (<u>Id.</u>) Over the next several days, Plaintiff had repeated episodes of vigorous coughing with blood, which subsequently resolved. (<u>Id.</u>) Plaintiff returned to his job, but was ultimately terminated because his respiratory symptoms made him unable to perform the tasks required of him. (Tr. 50.)

### C.        MEDICAL EVIDENCE IN THE RECORD

Plaintiff presented to Dr. Thomas Douglass, an occupational medicine specialist at the Duluth Clinic in Virginia, Minnesota, for the first time on November 16, 2004, reporting that he had inhaled paint and clear coat at work, which caused him to vomit and irritated his lungs, nose, and throat. (Tr. 332.) Plaintiff also reported that he had shortness of breath, fatigue, and weakness when walking. (<u>Id.</u>) Dr. Douglass noted that Plaintiff had no history of heart problems. (<u>Id.</u>) Plaintiff also reported that he was a smoker. (Tr. 333.) Dr. Douglass ordered an electrocardiography (EKG), diffusion capacity and lung volume test, and a pulmonary function exam for Plaintiff. (<u>Id.</u>) The EKG and diffusion capacity tests were normal. (<u>Id.</u>) Dr. Douglass noted that the pulmonary function exam results appeared normal, except for some decrease in Plaintiff's peak expiratory flow rate. (<u>Id.</u>) Dr. Douglass attributed the irregularity in Plaintiff's pulmonary function exam to Plaintiff's fatigue from the test. (<u>Id.</u>) Dr. Douglass also performed a comprehensive blood count (CBC) examination on Plaintiff that came back normal. (<u>Id.</u>) Dr.

Douglass's impression was that Plaintiff had "respiratory inhalation with respiratory tract irritation." (Tr. 334.) Dr. Douglass opined that Plaintiff needed to remain off work. (Id.)

On November 23, 2004, Plaintiff met with Dr. Douglass for a follow-up evaluation. (Tr. 330.) During this appointment, Plaintiff reported that his nose and throat irritation had resolved. (Id.) Nevertheless, Plaintiff told Dr. Douglass that he still felt fatigued and had pressure in his chest after any limited exertion (e.g., walking for 10 or 15 minutes or climbing stairs). (Id.) Plaintiff also told Dr. Douglass that he continued to smoke. (Id.) Dr. Douglass performed an echocardiogram test, which was normal. (Id.) Dr. Douglass called a cardiologist to discuss Plaintiff's symptoms, who recommended that Plaintiff schedule a dobutamine stress echocardiogram. (Tr. 331.) Dr. Douglass wrote that Plaintiff should remain off work until his stress echocardiogram examination. (Id.)

Plaintiff reported to Dr. Andrew C. Chiu, a cardiologist, on December 3, 2004, at the St. Mary's Medical Center in Duluth, Minnesota for a dobutamine stress echocardiogram examination. (Tr. 261.) The test results were negative for evidence of inducible wall motion, ischemia, intracardiac masses, thrombi, or pericardial effusion. (Tr. 262, 328.) The stress echocardiogram test showed a minor abnormality at the mitral valve accompanied by subjective complaints of shortness of breath and fatigue. (Tr. 262.)

Plaintiff met with Dr. Douglass to discuss the dobutamine stress echocardiogram test results on December 6, 2004. (Tr. 328.) Dr. Douglass told Plaintiff that the results showed a "lack of evidence of a significant cardiac or pulmonary problem that would explain the extreme symptoms of fatigue and chest pain symptoms with exertion." (Tr. 329.) Dr. Douglass also performed a heterophile mono screen and thyroid-stimulating hormone test, which were both normal. (Id.) Dr. Douglass suggested that Plaintiff take nitroglycerin tablets when he experienced

respiratory symptoms. (Id.) Dr. Douglass recommended that Plaintiff remain off work because Plaintiff continued to complain of residual symptoms of fatigue and chest tightness with exertion. (Id.)

When Plaintiff saw Dr. Douglass on December 10, 2004, his respiratory irritation, cough, and shortness of breath symptoms had subsided. (Tr. 326.) Plaintiff continued to have symptoms of chest pain and fatigue with exertion. (Id.) Plaintiff reported to Dr. Douglass that the nitroglycerin tablets "provided him quick relief from his chest pain symptoms and seemed to work fairly consistently for this." (Id.) Dr. Douglass noted that Plaintiff continued to smoke, but that he had cut back to half a pack per day. (Id.) Dr. Douglass advised Plaintiff to remain off work. (Tr. 327.)

Plaintiff saw cardiologist Dr. Gale Kerns on December 22, 2004, at the Duluth Clinic in Virginia, Minnesota. (Tr. 254.) Plaintiff complained of profound fatigue, shortness of breath, and chest pain. (Id.) Plaintiff also reported that he had smoked approximately one-half to one pack of cigarettes per day for the past 10 to 12 years. (Tr. 255.) Plaintiff noted that when he took a nitroglycerin tablet after exercise, his discomfort was relieved. (Tr. 254) Dr. Kerns reviewed Plaintiff's tests and determined that Plaintiff's chest x-ray, spirometry, and dobutamine stress echocardiogram tests results were normal. (Tr. 255.) Dr. Kerns suspected that something else could be causing Plaintiff's fatigue and opined, "[h]e appears sincere, but there is little in the way of objective finding [sic] at this point in time." (Id.) Dr. Kerns recommended additional testing, including a rheumatology examination. (Id.)

On December 28, 2004, Plaintiff had an appointment with Dr. Chiu for a treadmill examination. (Tr. 263.) Plaintiff was only able to exercise for two minutes and 20 seconds, with his heart rate increasing from 90 to 134 and his blood pressure increasing from 100/60 to 108/60.

(Id.) The treadmill test revealed no objective abnormalities, but Dr. Chiu noted that Plaintiff had a "markedly impaired exercise tolerance." (Id.)

Dr. Kerns performed a stress test on Plaintiff on January 3, 2005, to determine his heart rate, vital signs, and oximetry with exercise. (Tr. 257.) Plaintiff complained of fatigue, shortness of breath, and light-headedness, but did not complain of any chest discomfort. (Id.) Dr. Kerns concluded that Plaintiff had a "limited functional capacity" and "exercise-induced tachycardia." (Id.)

One day later, on January 4, 2005, Plaintiff met with Dr. Douglass to discuss the test results from his appointment with Dr. Chiu and Dr. Kerns. (Tr. 324.) Dr. Douglass noted that Plaintiff's treadmill exercise test indicated "extremely poor" tolerance for exercise. (Id.) Dr. Douglass also explained that Plaintiff's CBC, comprehensive biochemical profile, monospot, lyme screen, and thyroid-stimulating hormone tests were all negative. (Id.) Plaintiff reported to Dr. Douglass he developed tightness in his chest when he was shoveling snow in the last two weeks. (Tr. 325.) Dr. Douglass noted that when Plaintiff took a nitroglycerin tablet his chest pain ended promptly but that his chest pain lasted approximately one half-hour when he did not take a nitroglycerin tablet. (Id.) After this meeting, Dr. Douglass restricted Plaintiff from shoveling snow and recommended that Plaintiff exercise regularly. (Id.) He also told Plaintiff to remain off work for the next two weeks, until a follow-up evaluation was completed. (Id.)

On January 18, 2005, Plaintiff returned for a follow-up evaluation of his fatigue and weakness with Dr. Douglass. (Tr. 322.) Plaintiff told Dr. Douglass that he continued to have a decreased tolerance for exercise. (Id.) Plaintiff explained that two or three minutes of walking on the treadmill tired him and that shoveling snow (against doctor's orders) continued to induce tightness in his chest and shortness of breath. (Id.) Dr. Douglass informed Plaintiff that Dr. Kerns

would make him an appointment at the Mayo Clinic for an evaluation of his cardiovascular status. (Id. at 323). Dr. Douglass also referred Plaintiff to the Iron Range Rehab Center in Virginia, Minnesota for monitored readings of his exercise and cardiovascular conditioning. (Id.) Dr. Douglass noted that Plaintiff's respiratory symptoms had significantly subsided, but that he still had a relatively abnormal response to exercise. (Id.) Dr. Douglass concluded that Plaintiff's exercise tolerance was still too low for any manual labor type activity, but did not bar Plaintiff from working entirely. (Id.)

Plaintiff met with Dr. Douglass again on February 18, 2005. (Tr. 320.) Plaintiff complained that he continued to have difficulty exercising and would develop tightness in his chest when active. (Id.) Dr. Douglass tested Plaintiff's oxygen saturation levels at rest and with exercise. (Id.) Plaintiff had a 98 percent oxygen saturation level at rest and a 99 percent oxygen saturation level after three minutes of walking. (Id.) His heart rate increased from 118 to 125 during the three minutes of walking. (Id.) Dr. Douglass spoke with Dr. Kerns regarding Plaintiff's status, who suggested that Plaintiff should proceed with a heart catheterization to examine his coronary arteries. (Id., Tr. 321, Tr. 260.) Dr. Douglass released Plaintiff for sedentary work, but opined that Plaintiff had a limited ability to climb stairs or move around and that he could not be exposed to respiratory irritants. (Tr. 321.)

On March 4, 2005, Dr. Douglass reported to Plaintiff that his cardiac catheterization test results were normal. (Tr. 318.) Plaintiff stated that his chest pains during exertion had decreased in intensity. (Id.) Plaintiff also said that he planned to quit smoking. (Id.) Dr. Douglass suggested that Plaintiff use nitroglycerin tablets before exercise. (Tr. 319.) Dr. Douglass released Plaintiff for sedentary-type work, with limited stair climbing, and no exposure to respiratory irritants. (Id.)

In March 2005, Plaintiff went to the Mayo Clinic for an examination. (Tr. 266–90.) During his three-day visit, doctors specializing in cardiovascular diseases, pulmonary and critical care medicine, and otorhinolaryngology evaluated him. (Tr. 284, 279, 274.) Plaintiff underwent many tests to assess his health status including an echocardiogram, electrocardiogram, a stress test, and a CT scan of his chest, none of which showed any significant cardiovascular cause of his respiratory symptoms. (Tr. 277.) An otorhinolaryngologist performed a flexible fiberoptic endoscopy of Plaintiff's nose and found that Plaintiff's nasopharynx, hypopharynx, and larynx were clear, but that Plaintiff had a deviated nasal septum. (Tr. 274.) Finally, Plaintiff underwent a pulmonary function test with a methacholine challenge examination, which demonstrated a normal baseline spirometry and oximetry. (Tr. 276.) That test also revealed that Plaintiff had a reduced diffusion lung capacity for carbon monoxide. (Id.)

After reviewing Plaintiff's various examinations from the Mayo Clinic, Plaintiff's consulting physician, Dr. John J. Mullon, diagnosed him with presumptive respiratory airway dysfunction syndrome (RADS). (Tr. 276.) Dr. Mullon concluded that "[i]n spite of a technically normal methacholine challenge, the patient does have symptoms strongly suggestive of RADS." (Id.) Dr. Mullon gave Plaintiff a prescription for Advair 250/50, to be used one puff, twice per day. (Id.)

On April 27, 2005, Plaintiff reported to Dr. Douglass that he had improved markedly over the past month. (Tr. 316.) Plaintiff stated that he had been walking up to two and a half miles and could climb up three flights of stairs without difficulty. (Id.) Plaintiff told Dr. Douglass that he attempted to walk ever day (although he was not always able to do so), and was "not experiencing any symptoms of excessive fatigue as he was previously." (Id.) Plaintiff also told Dr. Douglass that when he goes walking with his ten-year-old child, his child "asks him to slow

down now." (Id.) Plaintiff reported continued use of Advair (one puff, two times daily) and Wellbutrin (one 150 mg. tablet, twice daily). (Id.) Plaintiff informed Dr. Douglass he used his Albuterol inhaler about once a week when he went to the mall. (Id.) Plaintiff reported that he had stopped smoking and that he had recently been exposed to gasoline vapors while pumping gas and "experienced irritation of his eyes, nose and throat. No tightness in his chest, but definitely irritative symptoms." (Id.) Dr. Douglass released Plaintiff to work "without restrictions except to avoid exposure to respiratory irritants that produce respiratory irritation." (Tr. 317.)

Plaintiff saw Dr. Douglass on July 1, 2005. (Tr. 314.) Dr. Douglass confirmed the Mayo Clinic's diagnosis of RADS, and found that it was "significantly improved on Advair." (Tr. 315.) Dr. Douglass had Plaintiff run in place for one minute, lifting his knees high, and found Plaintiff became "mildly short of breath" with no heart irregularities. (Id.) Dr. Douglass gave Plaintiff a prescription for Nasonex nasal spray to take two puffs, once daily in each nostril. (Id.) During this appointment, Dr. Douglass did not discuss any additional work restrictions for Plaintiff. (Id.)

Approximately two weeks later, on July 13, 2005, Plaintiff reported to Dr. Douglass that his Albuterol inhaler seemed to be helpful if he had shortness of breath, but that it did not always work. (Tr. 312.) Plaintiff reported that he continued his smoking cessation, and that he did not find being around cigarette smoke triggered any difficulty in his breathing. (Id.) Plaintiff reported that he had been working for a couple of months at a NAPA Parts Store, but that he recently was terminated. (Id., 30–31.) Dr. Douglass noted that Plaintiff "is somewhat down because of this, but is planning to go out and find another job." (Id.)

Plaintiff followed up with Dr. Douglass in September 2005, reporting that he was walking a mile per day, but complained that his symptoms were worse when the weather was hot and humid. (Tr. 310.) Plaintiff also stated that he had been unable to sleep. (Tr. 311.) Plaintiff

believed that his insomnia was related to the stress of his workers' compensation claim. (Id.) At an appointment in October 2005, Dr. Douglass noted that Plaintiff continued to have shortness of breath associated with irritant vapors and exertion, but that his symptoms "are improved with the use of Albuterol inhaler and with the use of the Advair twice daily." (Tr. 308.) Dr. Douglass referred Plaintiff to Dr. Mohamed Ali, a pulmonary specialist at the Duluth Clinic in Virginia, Minnesota for an evaluation. (Tr. 309.)

On October 18, 2005, Plaintiff presented to Dr. Ali. (Tr. 305–06.) Dr. Ali noted that Plaintiff had a methacholine challenge test, "which was borderline positive," and that Plaintiff had been diagnosed with RADS at the Mayo Clinic. (Tr. 305, 303.) Dr. Ali also wrote that Plaintiff had dramatic improvement from his symptoms with the use of Advair. (Id.) "His symptoms continue to improve except sometimes when he gets exposure to respiratory irritants including perfumes, gas, oil, even when he tries to pump gas in his car." (Id.) Dr. Ali continued, "[i]t seems the patient is still exposing himself to some respiratory irritants such as gas and perfumes. I recommended to the patient clearly that he has to stop exposing himself to any respiratory irritants including perfumes [and] pumping gas . . . . " (Tr. 306.) Finally, Dr. Ali stated that Plaintiff could work, but that he should avoid any respiratory irritants. (Id.)

In December 2005, Plaintiff had an appointment with Dr. Douglass. (Tr. 301.) He told Dr. Douglass that he continued to have considerable fatigue with exertion. (Id.) He reported that he walked a mile a day and had been hunting: "He has gone out and walked on one occasion up to a mile and sat in a deer stand. He helped another individual with a deer, but was considerably fatigued by this activity." (Id.) Dr. Douglass also spoke with Plaintiff's qualified rehabilitation consultant (QRC), Ms. Helen Thran. (Tr. 302.) After that conversation, Dr. Douglass noted that Plaintiff's "job search has been difficult trying to find employment options that are relatively free

from triggers, fumes, vapors, and perfumes." (Tr. 302.) Dr. Douglas recommended that Plaintiff do sedentary work and start on a part-time basis. (Id.)

Plaintiff met with Dr. Douglass again in January 2006 and reported that the cooler weather helped his breathing. (Tr. 298.) He stated that he had been walking around the lake one mile and that he walked on his street throughout the day. (Id.) Plaintiff continued to report symptoms of fatigue and shortness of breath with exertion. (Id.) Plaintiff also informed Dr. Douglass that he was still having difficulty with his job search. (Id.) Dr. Douglass stated, "[h]e has difficulty identifying a job that he can do without exposure to respiratory irritants and one that he has an inclination to do." (Id.) Dr. Douglass opined that Plaintiff would likely need retraining at school to obtain employment. (Id.) The doctor noted that Plaintiff could work at a sedentary or possibly light exertional level. (Id. at 299)

In February 2006, Plaintiff reported to Dr. Douglass that he had some improvement in his breathing and tolerance of exercise with a recent increase in Advair. (Tr. 296.) Dr. Douglass spoke with Plaintiff's physical therapist who indicated he saw a marked improvement with Plaintiff's exercise tolerance due to the Advair medication. (Tr. 297.) Plaintiff stated that he continued to feel significantly restricted in his activities. He shopped for groceries during off hours to avoid being around people and could no longer go to the movie theater because of the odors. (Id.) Dr. Douglass opined that Plaintiff should continue to avoid "irritant vapors and odor[s]" and should search for a job that would allow Plaintiff to work at home or in an environment where Plaintiff would have limited interaction with people coming to the office. (Id.) Dr. Douglass released Plaintiff to work with the same restrictions as previously noted, but stated that the restrictions were "permanent and indefinite." (Id.)

On March 14, 2006, Plaintiff reported to Dr. Douglass that he had increased symptoms of fatigue and that it took him longer to recover from exercises at physical therapy. (Tr. 294.) Plaintiff stated that he recently went to a family function at a restaurant and noticed tightness in his chest and difficulty breathing because he was in the room with a number of people. (Id.) The QRC, Ms. Thran, accompanied Plaintiff to his appointment with Dr. Douglass to discuss possible employment opportunities for Plaintiff. (Id.) Dr. Douglass stated that Plaintiff was best suited to work in an environment with computers or telephones, where he has more control over his environment. (Tr. 295) Dr. Douglass and Ms. Thran discussed whether Plaintiff might be eligible for Social Security Disability benefits. (Id.) Ms. Thran said she would pursue opportunities to allow Plaintiff to work in his home. (Id.)

Plaintiff met with Dr. Ali on April 10, 2006, to discuss his respiratory problems. (Tr. 423.) Dr. Ali recommended that Plaintiff increase his inhaled steroid medication by adding Asmalix 220 inhalation twice a day. (Id.) Dr. Ali also recommended that Plaintiff discontinue using Singulair because it was not effective for Plaintiff. (Id.) Finally, Dr. Ali told Plaintiff to continue using the Albuterol medication as needed. (Id.)

On April 17, 2006, Plaintiff reported to Dr. Douglass that he had not had any significant improvement in his breathing or tolerance for exercise during the past month. (Tr. 292.) Plaintiff did report, however, that the new inhaler prescribed by Dr. Ali did help with some of his symptoms. (Id.) Plaintiff had been going to physical therapy and his tolerance for exercise had improved from very low to sedentary, and possibly light, work level activity. (Id.) Dr. Douglass wrote that Plaintiff "appears to have approached a plateau for his exercise tolerance." (Id.) Ms. Thran again accompanied Plaintiff to this meeting and discussed Plaintiff's employment opportunities with Dr. Douglass. (Id.) Ms. Thran suggested that Plaintiff should work from home

on a computer, but acknowledged this was difficult because Plaintiff was slow at typing. (Id.) Dr. Douglass recommended that Plaintiff take a typing tutorial program. (Id.) Dr. Douglass also requested that Plaintiff undergo a functional capacity evaluation (FCE). (Id.)

Plaintiff had a follow-up appointment with Dr. Ali on May 12, 2006, to discuss his new medications. (Tr. 419.) Plaintiff explained to Dr. Ali that he continued to have the same symptoms and did not feel he experienced a significant change from his April appointment. (Id.) Dr. Ali started Plaintiff on a low dose of Prednisone at 10 mg. per day. (Id.)

On May 17, 2006, Plaintiff had an appointment with Dr. Douglass. (Tr. 417.) At that appointment, Plaintiff told Dr. Douglass that he had not filled his prescription for Prednisone nor completed his FCE. (Id.) Plaintiff reported to Dr. Douglass that he continued to modify his lifestyle because of his symptoms. (Id.) For example, Plaintiff reported that he had asked Target employees to move soaps and perfumes away from the prescriptions counter where he picks up his medications. (Id.) Plaintiff brought Dr. Douglass forms from Tom Ehrbright of Disability Specialists Inc., who was assisting Plaintiff in applying for Social Security Disability benefits. (Tr. 418.) Dr. Douglass told Plaintiff he would fill out the Social Security Disability benefits forms after Plaintiff completed a FCE. (Id.) Additionally, Dr. Douglass met with Plaintiff's QRC. (Id., Tr. 211.) Dr. Douglass and Ms. Thran discussed Plaintiff's employment opportunities and Dr. Douglass recommended "a surveillance job" for Plaintiff. (Tr. 418.)

After Plaintiff's appointment with Dr. Douglass, Plaintiff completed his FCE at the Iron Range Rehab Center. (Tr. 345–361.) Dean Rosier, a physical therapist, conducted the FCE. (Tr. 378.) Mr. Rosier noted that Plaintiff was capable of sitting and standing constantly, but could only walk occasionally. (Id.) Further, Mr. Rosier noted that Plaintiff was able to occasionally lift 10 pounds, carry 15 pounds 30 feet, and push or pull 35 pounds. (Id.) Based on this information,

Mr. Rosier concluded that Plaintiff should be restricted to sedentary level work. (Id.) Mr. Rosier also noted that Plaintiff did not exhibit signs of disability symptom exaggeration during the test and passed 97 percent of his validity criteria that was assessed. (Tr. 377, 395.) Dr. Douglass signed off on Mr. Rosier's FCE results on June 6, 2007, but added the restriction that Plaintiff was to "avoid exposure to fumes, odors, vapors, perfumes, and other respiratory irritants." (Tr. 378, 413.)

Plaintiff had a follow-up appointment with Dr. Ali on June 2, 2006, to discuss whether the Prednisone medication helped resolve his symptoms. (Tr. 415.) Plaintiff explained to Dr. Ali that he had felt a dramatic improvement in his symptoms and "felt he is almost back to normal" after using Prednisone. (Id.) Plaintiff told Dr. Ali that he was not having trouble when around perfumes or respiratory irritants, and that he was able to cut his lawn and do a lot of walking compared to what he was able to do previously. (Id.) Dr. Ali recommended that Plaintiff continue taking Prednisone at 10 mg. per day for at least three months. (Id.)

On June 7, 2006, Plaintiff had an appointment with Dr. Douglass. (Tr. 412.) Plaintiff explained to Dr. Douglass that he "had a sense of general improvement in his well being since starting the Prednisone . . . ." (Id.) Plaintiff also reported that his mood had improved and that he had more energy. (Id.) Over the last three weeks, Plaintiff had stopped using his Albuterol inhaler because he was not experiencing respiratory problems. (Id.) Plaintiff also told Dr. Douglass that he went to Target when it was busy and did not experience any problems. (Id.) Nevertheless, Plaintiff reported to Dr. Douglass that he continued to get tired easily and periodically got headaches and tightness in his chest when exposed to perfume. (Id.)

Immediately after Plaintiff's appointment with Dr. Douglass on June 7, 2006, Dr. Douglass met with Ms. Thran to discuss Plaintiff's May 18, 2006 FCE. (Tr. 344, 413.) Dr.

Douglass told Ms. Thran that Plaintiff's FCE showed that he was functioning at the "sedentary level." (Tr. 344) Dr. Douglass further noted that Plaintiff's "Functional Capacity Evaluation supported rather significant limitations in physical capabilities" and that Plaintiff is functioning at about "the tenth percentile in terms of activity tolerance." (Id.)

In June 2006, Dr. Douglass wrote a letter to Mr. Ehrbright opining that it would be "very difficult for [Plaintiff] to maintain competitive employment as options available to him would appear to be extremely limited in terms of securing employment with his limitations." (Tr. 396.) He further opined that Plaintiff could perform sedentary work, but needed to avoid respiratory triggers such as, "fumes, vapors, perfumes, and odors." (Id.) Dr. Douglass also noted that Plaintiff likely did not have an underlying cardiovascular problem, but that doctors at the Mayo Clinic diagnosed him with RADS because of a borderline positive methacholine challenge test. (Tr. 397.)

On July 11, 2006, Plaintiff reported to Dr. Douglass that since he started to take Prednisone, "he feels overall better." (Tr. 410.) Plaintiff told Dr. Douglass that he had increased difficulties breathing in the last few days because of the humidity and increased temperature. (Id.) Plaintiff also informed Dr. Douglass that he had tried to participate in activities that he was not physically ready to do and overdid it. (Id.) Dr. Douglass noted that Plaintiff "is experiencing some mild euphoric effects from the Prednisone and has a general sense of well being from this, but still seems to have significant limitation for physical activities." (Tr. 411.) Plaintiff's QRC accompanied Plaintiff to this appointment. (Id., 203.) Dr. Douglass noted that Plaintiff was looking into the possibility of working at Gander Mountain, a sports equipment store. (Tr. 410.) Dr. Douglass cautioned that, by working at Gander Mountain, Plaintiff might be exposed to a

number of people wearing perfume. (Id.) Dr. Douglass recommended that Plaintiff find work "that he could do from his home on the phone or on the Internet." (Id.)

Plaintiff had a follow-up appointment with Dr. Ali on August 4, 2006, to discuss the Prednisone medication. (Tr. 472.) Dr. Ali noted that "[i]t seems he is doing better at the current time, although he continued to use Albuterol significantly." (Id.) Dr. Ali recommended that Plaintiff decrease his Prednisone prescription from 10 mg. daily to 10 mg. every other day, with the caveat that if Plaintiff had problems, then he should switch back to a daily 10 mg. dose. (Id.)

Plaintiff had a follow-up appointment with Dr. Douglass on August 11, 2006. (Tr. 408.) Plaintiff noted that Dr. Ali had decreased his Prednisone medication prescription and that Plaintiff continued to use his Nasonex medication as well as his Albuterol inhaler due to the increased humidity and heat. (Id.) Plaintiff stated that his workers' compensation attorney and Ms. Thran questioned whether Plaintiff's symptoms were from panic attacks. (Id.) Dr. Douglass told Plaintiff "his symptoms did not suggest panic attacks." (Id.)

In September 2006, Plaintiff had another appointment with Dr. Douglass. (Tr. 468.) Dr. Douglass's medical practice had recently moved buildings and Plaintiff reported that the new carpeting and furniture aggravated his respiratory symptoms. (Id.) Plaintiff told Dr. Douglass that he recently went out riding his four-wheeler with his son for approximately six hours, "but had to come back and rest in the house periodically." (Id.) Plaintiff also informed Dr. Douglass that he increased his Prednisone medication back to 10 mg. daily because of episodes of shortness of breath and tightness in his chest. (Id.) After the appointment, Dr. Douglass met with Ms. Thran and Plaintiff. (Tr. 469.) At that time, Plaintiff was still unable to find employment within his restrictions. (Id.)

At Plaintiff's next appointment with Dr. Douglass, on November 13, 2006, Plaintiff continued to have increased respiratory symptoms because of Dr. Douglass's new building. (Tr. 466.) Plaintiff also reported that he still had symptoms of fatigue and shortness of breath with exertion. (Id.) Plaintiff mentioned that he had some stress issues recently because he was breaking up with his girlfriend. (Id.) Plaintiff continued to take 10 mg. of Prednisone daily and continued his prescription for Advair Diskus, Albuterol inhaler, Wellbutrin, and Nasonex. (Id.)

Dr. Douglass also wrote a letter to Plaintiff's attorney, Mr. Gustav Layman, on November 13, 2006. (Tr. 432.) Dr. Douglass stated that he believed Plaintiff's condition was stable and that he thought Plaintiff "is probably at maximum medical benefit from the standpoint of his exposure to vapors at his place of employment, 2nd Avenue Auto . . . . " (Id.) Dr. Douglass noted that Plaintiff had RADS, which is "not specially covered under the Disability Schedules provided by Minnesota Workers' Compensation law." (Id.) Nevertheless, Dr. Douglass concluded that Plaintiff's "case would be more appropriately rated under 5223.0180 of the Workers' Compensation schedules dealing with injuries to the respiratory system." (Id.) Dr. Douglass continued, "[u]nder Subpart 2, it provides for 30% whole body disability in situations where dyspnea occurs at rest but does occur during usual activities of daily living," which was the case for Plaintiff's symptoms. (Id.) As such, Dr. Douglass concluded that Plaintiff's symptoms should be evaluated as a "permanent partial disability." (Id.)

Plaintiff had an appointment with Dr. Amer Azar, a family practice physician at the Duluth Clinic-Virginia, on December 24, 2006, complaining of itchy knuckles. (Tr. 459.) Dr. Azar told Plaintiff to increase his dosage of Prednisone to 40 mg. daily for five days. (Id.) After five days, Plaintiff was to decrease the dosage to 20 mg. daily. (Id.)  After the itchiness subsided, Dr. Azar told Plaintiff to take 10 mg. of Prednisone every other day. (Id.)

Plaintiff had a follow-up appointment with Dr. Douglass on January 15, 2007. (Tr. 457.) Plaintiff told Dr. Douglass about his knuckle problems and his increased dosage of Prednisone. (Id.) Plaintiff noted that he was no longer experiencing swelling in his hands. (Id.) Plaintiff complained of a decreased tolerance for physical exercise, shortness of breath, and breathing problems when around fumes and odors. (Id.) Plaintiff requested that Dr. Douglass fill out forms regarding his health condition for the Department of Health Services in St. Louis County. (Id.) On the forms, Dr. Douglass wrote that Plaintiff was "able to complete reading assignments, research career options, complete homework, [and] complete handouts" and that "[p]rimarily sedentary classification of work" was best for Plaintiff but with "[n]o exposure to respiratory aggravating factors.  No work around fumes, vapors, odors, humidity, perfume, smoke, etc." (Tr. 458.) Plaintiff continued his prescriptions of: Prednisone (10 mg., daily); Wellbutrin (150 mg., daily); Nasonex (50 mg., two sprays each nostril daily); Albuterol inhaler (one or two puffs up to four times daily); and Advair Diskus 500/50 (one puff, twice daily). (Id.)

On April 6, 2007, Plaintiff had an appointment with Dr. Douglass. (Tr. 450.) Plaintiff told Dr. Douglass that he recently moved to his parent's house and experienced some episodes of shortness of breath. (Id.) Plaintiff described his pain as "a 3 to 5 on a scale of 0 to 10" and noted that it was fairly constant. (Id.) Plaintiff had an electrocardiogram and cardiolite stress EKG, which were both normal. (Tr. 451.) Dr. Douglass increased Plaintiff's Prednisone medication to 40 mg. a day for three days and then slowly tapered it back down to 10 mg. a day. (Id.)

Plaintiff had another appointment with Dr. Douglass on April 13, 2007. (Tr. 448.) At that appointment, Plaintiff stated that his respiratory symptoms had improved since his Prednisone medication was increased. (Id.) Plaintiff continued to complain of sinus problems and Dr.

Douglass referred him to Dr. Jim Johnson, an ear, nose, and throat (ENT) specialist at the Duluth Clinic in Virginia, Minnesota. (Tr. 449.)

On April 16, 2007, Plaintiff had an appointment with Dr. Ali. (Tr. 446.) Plaintiff told Dr. Ali that he recently moved in with his parents, which caused an increase in his respiratory symptoms. (Id.) Dr. Ali recommended that the Plaintiff find a different living arrangement and told Plaintiff to take Prednisone when needed. (Tr. 447.)

Plaintiff underwent an ENT examination by Dr. Jim Johnson on April 16, 2007. (Tr. 444.) Plaintiff told Dr. Johnson that his main sinus complaint was headaches. (Id.) Dr. Johnson performed a physical examination of Plaintiff, which was normal. (Tr. 445.) Dr. Johnson did note, however, that Plaintiff appeared to have a deviated septum. (Id.) Dr. Johnson ordered a CAT scan of Plaintiff's sinuses to evaluate his sinus problems. (Id.)

On April 23, 2007, Dr. Johnson told Plaintiff that the CAT scan showed "mild mucosal thickening in the left maxillary sinus, and also deviation of the nasal septum to the left." (Tr. 441.) Dr. Johnson recommended that Plaintiff get the following procedures: (1) a septopasty, (2) outfracture of turbinates, and (3) left maxillary sinusotomy for cleaning out left maxillary sinus. (Tr. 442.) Plaintiff told Dr. Johnson that he was worried about having surgery because of his RADS disease and wanted Dr. Douglass's opinion before proceeding. (Id.)

At his next appointment, Plaintiff met with Dr. Douglass on April 27, 2007 and noted that he stopped having tightness in his chest and shortness of breath, but continued to have respiratory irritation when exposed to perfumes and odors. (Tr. 439.) Plaintiff discussed his appointment with Dr. Johnson, but Dr. Douglass did not make a recommendation to Plaintiff about nose surgery. (Id.) Plaintiff also told Dr. Douglass that his insurance company wanted him

to get an independent medical examination (IME) to determine the accuracy of the Mayo Clinic's RADS diagnosis. (Tr. 440.)

Plaintiff's next appointment with Dr. Douglass was on July 27, 2007. (Tr. 501.) Plaintiff reported discontinuing his Advair Discus medication, but increasing his Prednisone medication to 40 mg. per day. (Id.) He also told Dr. Douglass that he continued to use Nasonex and the Albuterol inhaler. (Id.) Plaintiff discontinued use of Wellbutrin either because it was not renewed or because his insurance company refused to pay for it. (Id.) Dr. Douglass noted that he did not recall Plaintiff asking him to renew his Wellbutrin medication, but did give Plaintiff a new prescription at the end of the appointment. (Id., Tr. 502.) Plaintiff also reported that "he has not been able to find employment" and that he continues to have respiratory problems. (Tr. 501.) Dr. Douglass administered a Zung depression-screening inventory during this appointment because Plaintiff reported, "feeling down hearted, blue and sad some of the time." (Tr. 502.) The Zung depression screening indicated that Plaintiff had "minimal to mild depression." (Id.) At the conclusion of the appointment, Dr. Douglass asked Plaintiff whether he wished to return to the Mayo Clinic to see a pulmonary specialist again, but Plaintiff declined. (Id.)

On July 30, 2007, Plaintiff scheduled an appointment with Dr. Douglass to renew his Department of Transportation (DOT) certification. (Tr. 498.) Dr. Douglass performed a physical examination of Plaintiff and recommended that Plaintiff's DOT certification be renewed for two years, subject to the limitation that Plaintiff wear corrective lenses. (Tr. 499.)

Plaintiff had an appointment with Dr. Ali on November 12, 2007. (Tr. 493.) Plaintiff told Dr. Ali that he continued to take high doses of Prednisone (30 mg. per day) to mitigate his respiratory symptoms. (Id.) Dr. Ali was worried about Plaintiff's high dosage of Prednisone and advised Plaintiff to "cut down on prednisone by 5 mg. every few days." (Id.) Dr. Ali also

prescribed Plaintiff Pulmicort Flexihaler, an inhaled steroid, with the recommendation to perform two inhalations, twice a day. (Id.)

At Plaintiff's request, Dr. Douglass wrote a letter to Plaintiff's attorney, Mr. Gustav C. Layman, on January 2, 2008 discussing his respiratory condition. (Tr. 491.) Dr. Douglass told Mr. Layman that Plaintiff's condition was "relatively rare" and that he did "not recall having seen another individual similarly affected to Mr. Anderson in my thirty-three years of practicing medicine." (Id.) Further, Dr. Douglass wrote that he did not believe the current respiratory guidelines fairly approximated the functional loss sustained by Plaintiff. (Id.) Dr. Douglass also noted that, in his opinion, Plaintiff has a "30% permanent partial disability." (Id.)

On January 16, 2008, Dr. Ali wrote a letter to Mr. Layman stating that Plaintiff suffered from "a rare pulmonary condition called reactive airway dysfunction syndrome." (Tr. 490.) Dr. Ali further noted that Plaintiff's "condition is not classic asthma, and should not be treated with the usual [workers'] compensation formula for asthma." (Id.)

Plaintiff had an appointment with Dr. Douglass on February 6, 2008, to discuss his respiratory problems. (Tr. 487.) Plaintiff reported that he had recently settled his case with his workers' compensation insurance carrier. (Id.) Plaintiff also reported that he planned to apply for Social Security Disability benefits. (Id.) Plaintiff's low tolerance for exercise and respiratory problems when exposed to perfumes and vapors continued. (Id.) Plaintiff also continued taking Prednisone, Albuterol inhaler, Pulmicort inhaler, and Wellbutrin. (Id.) At the conclusion of the appointment, Dr. Douglass filled out a "Physician's Report of Workability" and wrote that Plaintiff was unable to work for an "indefinite" period. (Tr. 489.)

Two days later, on February 8, 2008, Dr. Douglass wrote a letter to Mr. Matthew Ehrbright of Disability Specialists, Inc. on behalf of Plaintiff. (Tr. 474, 485.) Dr. Douglass wrote

that he did not "believe [Plaintiff] would be able to sustain competitive employment in most situations because of his unusual sensitivity to chemical odors, fumes, perfumes, and solvents . . . ." (Tr. 474, 485.) Dr. Douglass stated that Plaintiff "has [sic] inability to maintain more than a sedentary type activity and is not able to do any sustained physical exertion." (Tr. 474, 485.) Dr. Douglass also attached a form describing Plaintiff's medical condition to the Minnesota Department of Human Services. (Tr. 478.) Dr. Douglass stated that Plaintiff "can perform limited employment now" at a sedentary or low activity level as long as Plaintiff does not expose himself to respiratory irritants. (Tr. 479.)

On March 28, 2008, Plaintiff had an appointment with Dr. Douglass. (Tr. 482.) Plaintiff continued use of the following medications: Prednisone (at a lower dosage of 25 mg. per day), Albuterol inhaler, Pulmicort, and Nasonex. (Id.) Plaintiff told Dr. Douglass that he was waiting for a court date on his Social Security Disability claim. (Id.) Plaintiff continued to report symptoms of "constriction of his breathing, tightness in his chest associated with any irritant fumes or vapors or smells." (Id.) Dr. Douglass filled out another "Physician's Report of Workability" stating that Plaintiff was unable to work for an "indefinite" period. (Tr. 484)

Plaintiff had an appointment with Dr. Ali on April 2, 2008. (Tr. 480.) Dr. Ali reported that Plaintiff "has been doing very well, on a stable dose of prednisone." (Id.) Dr. Ali noted that Plaintiff had decreased his Prednisone intake to 20 mg. per day. (Id.) Dr. Ali further explained that Plaintiff reported "[n]o cough or difficulty breathing or chest pain. No wheezing or palpitation or swelling of the legs." (Id.) Dr. Ali told Plaintiff that he should attempt to cut down his Prednisone intake to 5 mg. per day and to complete a "pulmonary follow up once a year." (Id.) Dr. Ali also filled out a "Physician's Report of Workability" where he stated that Plaintiff was unable for work, but did not specify a period for this restriction. (Tr. 481.)

**D.       RECORDS FROM PLAINTIFF'S QRC**

Following his work injury, Plaintiff began working with a QRC, Ms. Thran, in June of

2005, upon the recommendation of his attorney. (Tr. 245, 437.)  Ms. Thran helped Plaintiff

navigate the workers' compensation system in Minnesota and assisted him in finding new

employment. Ms. Thran has been a QRC with the Vocational Rehabilitation Unit of the

Minnesota Department of Labor and Industry for 20 years. (Tr. 201.) Ms. Thran would

frequently accompany Plaintiff to appointments with Dr. Douglass to discuss Plaintiff's

employment opportunities. (Tr. 194, 197, 198, 203, 208, 211, 214, 219, 225, 234, 294, 334, 410,

413, 417, 469.)

In a note dated November 8, 2005, Ms. Thran stated that Plaintiff had applied for jobs,

but that many exposed him to chemicals or cleaning products. (Tr. 238.) Ms. Thran also

discussed with Plaintiff the possibility of him going back to school to get new educational

training, but discounted the idea after realizing that the school environment would expose

Plaintiff to people wearing aftershave or perfume. (Id.)

Later that month, Ms. Thran called Plaintiff to discuss the possibility of working for

Minnesota Diversified Industries (MDI) making plastic totes for the U.S. Postal Service. (Tr.

237.) Ms. Thran noted that she called the human resources manager at MDI who informed her

that the job would not require much exposure to toxic fumes. (Id.) Nothing came from this job

opportunity because Plaintiff was concerned about the physical endurance and exposure to

respiratory irritants that might occur on the job. (Tr. 236.)

Plaintiff had another appointment with Ms. Thran on December 28, 2005. (Tr. 227.) Ms.

Thran and Plaintiff discussed possible employment options. (Id.) Plaintiff explained to Ms.

Thran that he "would prefer not to have to work with a group of people" so that he would not be

exposed to perfumes and odors. (Id.) Plaintiff also stated that when he worked as a cashier previously he "liked to work the late shift because then there are fewer customers." (Id.) Plaintiff also noted that in the past he worked as a security guard at nightclubs, but thought this was no longer an option because "the smoke is an aggravating factor." (Id.)

On January 17, 2006, Plaintiff met with Ms. Thran to discuss employment opportunities. (Tr. 225.) Plaintiff discussed his interest in "worm farming," which he had been researching on the internet. (Id.) Plaintiff also noted that radiology interested him and Ms. Thran told him that Lake Superior College offers radiology classes. (Id., Tr. 224.) After meeting with Dr. Douglass, however, Plaintiff decided that he was unable to go to school because of the "unpredictable exposure to chemicals that may precipitate problems." (Tr. 221, 219.)

In February 2006, Plaintiff revisited the idea of attending classes at Lake Superior College with Ms. Thran. (Tr. 222.) Plaintiff reported to Ms. Thran that he was feeling "a whole lot better" and was able "to do more" because of his new medications prescribed by Dr. Ali. (Tr. 223.) In a note dated February 14, 2006, Ms. Thran stated that Plaintiff "would be checking with Dr. Douglass regarding the ability to physically attend school." (Id.) Ms. Thran informed Plaintiff that it takes "a tremendous amount of energy to attend school," but Plaintiff stated he had been reviewing materials from Lake Superior College and had a meeting with the school scheduled during the week of February 20, 2006. (Id.)

Ms. Thran wrote in a note dated March 21, 2006 that Plaintiff reported he was exploring the possibility of deer hunting on his Uncle's farm. (Tr. 217.) Plaintiff recognized that this job required working with animals and that he would not be able to "wrestle with 100-150 pound deer." (Tr. 217.) Plaintiff also discussed raising pheasants, but was concerned that "the Avian Flu

is making it difficult to order and transport birds out of state." (Id.) Ms. Thran recommended that Plaintiff call Fingerhut to see if they need someone to work in its call center. (Id.)

Plaintiff met with Ms. Thran on June 7, 2006, after meeting with Dr. Douglass. (Tr. 208.) Plaintiff told Ms. Thran that he planned to file for Social Security Disability benefits. (Id.) Ms. Thran stated in her note that Plaintiff "maybe to [sic] young for them to look at that as an issue but he is proceeding." (Id.) Ms. Thran further noted that she had spoken with other QRCs and was unable to find employment for Plaintiff that would not require him to be exposed to respiratory irritants. (Id.)

Ms. Thran wrote a letter on July 24, 2006, in support of Plaintiff's Social Security Disability Claim. (Tr. 201, 202, 426.) In the letter, Ms. Thran stated that Plaintiff has been unable to find employment because of his "inability to safely venture out into public places." (Tr. 201.) Ms. Thran wrote, "Dr. Douglass had continued to stress the need for [Plaintiff] to control his physical environment in order to reduce his exposure to airborne irritants." (Id.) Ms. Thran noted that Dr. Douglass suggested that Plaintiff work at home on his computer, but that had not proven possible because Plaintiff "needs additional training . . . that would require him to attend school, which would then expose him to airborne irritants." (Id.) Further, Ms. Thran concluded that even if Plaintiff were able to work from home, his business might have customers that would expose him to the "potential of irritants." (Id.)

On July 25, 2006, Plaintiff had a phone conversation with Ms. Thran. (Tr. 200.) Plaintiff stated that he had injured his hand, which might affect his typing speed. (Id.) Ms. Thran and Plaintiff discussed home transcription as possible employment, but recognized that these jobs usually require employees to type 60 words per minute with accuracy. (Id.) Plaintiff also told

Ms. Thran that he had two interviews at Gander Mountain, but that he had failed his background check because of "credit issues." (<u>Id.</u> 198.)

In a note from Ms. Thran dated August 21, 2006, she stated that Plaintiff applied for a job with David Stall, a collections agent, as a file clerk. (Tr. 197.) Nothing came of Plaintiff's application. (<u>Id.</u>) In November 2006, Ms. Thran wrote that Plaintiff was looking into telemarketing positions in Duluth or possibly working as a full-time cashier. (Tr. 191.)

According to Ms. Thran, Plaintiff attempted to attend a job fair on October 23, 2006, but was unable to because there were too many people. (Tr. 192.) Plaintiff continued his search for jobs and scheduled a meeting with Ms. Thran for later in the week. (<u>Id.</u>) Ms. Thran also told Plaintiff that his first responder certification would expire in December and provided Plaintiff the location of a renewal class near Plaintiff's residence. (<u>Id.</u>)

Plaintiff stated to Ms. Thran on November 14, 2006, that he did not have the "endurance to make it thru an 8 hour day." (Tr. 189.) Plaintiff told Ms. Thran that the Social Security Administration "feels that he is young enough for retraining." (<u>Id.</u>) Ms. Thran opined that while it is true that Plaintiff is young enough for retraining, Plaintiff would have a problem attending an educational institution because of the possibility of exposure to cleaning agents and perfumes. (<u>Id.</u>) Ms Thran noted that Plaintiff continued to search for new job postings. (<u>Id.</u>)

Ms. Thran wrote a letter to Plaintiff's former attorney in February 2007. (Tr. 437.) Ms. Thran explained that Plaintiff's work history included work as a bartender, bouncer, car detailer, light auto mechanic, and auto body work. (<u>Id.</u>) Ms. Thran noted that Plaintiff volunteered in the past as a first responder and firefighter. (<u>Id.</u>) Ms. Thran stated that this background provided Plaintiff with customer service skills, but she recognized that customer service jobs would expose Plaintiff to respiratory irritants. (<u>Id.</u>) Ms. Thran explained that Plaintiff has explored the

option of working at home to avoid respiratory irritants, but that most possibilities required high-speed internet access, which was not available in Plaintiff's neighborhood. (<u>Id.</u>) Ms. Thran opined that to work from home, Plaintiff would need to attend an educational institution to gain more training. (<u>Id.</u>) However, Ms. Thran noted that schooling opportunities would be problematic for Plaintiff because they would expose him to airborne irritants. (Tr. 438.) Accordingly, Ms. Thran concluded that Plaintiff was unlikely to be placed in competitive employment because of his respiratory problems. (<u>Id.</u>)

Ms. Thran met with Plaintiff on May 8, 2007, and Plaintiff told Ms. Thran that he had expanded his job search to the Arrowhead Region, which is around "50 miles from his home." (Tr. 178.) However, Ms. Thran and Plaintiff were unable to find any appropriate jobs for him because of the potential exposure to respiratory irritants. (<u>Id.</u>) He had been in touch with people from Minnesota Twist Drill to package "drill bits" at his home, but determined that he could not do the job because it meant, "handling things with petroleum products on them for rust protection." (<u>Id.</u>) Ms. Thran noted, "anytime he does anything physical that could be up to 1 hour in activity, he had to nap for 1 ½ hours up to two hours to recover." (<u>Id.</u>)

Ms. Thran stopped working with Plaintiff on March 26, 2008, because Plaintiff's workers' compensation case was settled. (Tr. 510.) Ms. Thran noted that when she stopped working with Plaintiff, he was still unemployed. (<u>Id.</u>)

### E.  HEARING TESTIMONY

Plaintiff and vocational expert (VE) Kenneth E. Overland testified at the June 2008 hearing before ALJ Thomas. No medical expert opinion was offered at the hearing.

### 1.     Plaintiff's Testimony

At the time of the hearing, Plaintiff was six feet and one inch tall and weighed 200 pounds. (Tr. 29.) Plaintiff testified that his only source of income was general assistance (GA) funding from the state of Minnesota. (Tr. 30.) He had been receiving that funding for about two or three months. (Id.) Plaintiff stated he had smoked for approximately five to seven years prior to quitting in December 2003 or 2004. (Tr. 36.)[1] Plaintiff estimates that he smoked approximately one-half to one pack of cigarettes per day. (Tr. 36.) Plaintiff testified that he had no history of using street drugs, marijuana, or alcohol on a regular basis. (Tr. 36.)

At the hearing, Plaintiff testified that he could walk a mile, although slowly, because he had problems breathing. (Tr. 36, 37.) Plaintiff had to move his residence multiple times to control his exposure to odors. (Tr. 46.) Plaintiff moved into his parents' home, but left shortly thereafter because he was exposed to "too many different kinds of shampoos and -- different people smell different." (Tr. 46.)

Plaintiff testified that he was generally able to feed, dress, and bathe himself, but his mother did his laundry because the laundry detergent and fabric softener caused a respiratory reaction. (Tr. 36, 38, 45, 46). Plaintiff's mother lived 300 feet away from him. (Tr. 38.) Plaintiff also stated that he did his own grocery shopping (Tr. 38), but he shopped late at night when there were no crowds and before the store had been cleaned. (Tr. 47.) Plaintiff told the ALJ that he had to make appointments with the local Target pharmacy so he could pick up his medications without being exposed to perfumes and odors. (Tr. 46.)

Plaintiff stated that he did not suffer respiratory problems when he was not exposed to odors and perfumes, but that he used Prednisone and an inhaler to help with his respiratory

---

[1] Plaintiff reported to Dr. Douglass that he stopped smoking in April 2005. (Tr. 316.)

problems. (Tr. 46, 48.) Plaintiff stated that his medication caused him to gain 60 pounds and wrecked his teeth. (Tr. 46.) Plaintiff also testified that it was hard for him to use his inhaler because it caused his heart to race and tired him out. (Tr. 49.) Plaintiff also told ALJ Thomas that he had an emergency inhaler, but that he avoided using it when possible. (Tr. 42.) Plaintiff did note, however, that the last time he used his "emergency inhaler" was "[p]robably two weeks ago when I went to the store." (Tr. 41.) Plaintiff also stated that he used his "emergency inhaler" on the day of the hearing before the ALJ. (Tr. 41–42.)

Plaintiff had not been employed full-time since the onset of his disabilities, but had worked part-time for an auto parts store for a period of about three months in approximately 2005 and as a truck driver sometime between 2006 and 2007. (Tr. 30–31, 33.) At the auto parts store, Plaintiff reported that he could not perform the work because it was "too fast paced" and he could not tolerate exposure to some of the chemicals used at the store. (Tr. 32.) Plaintiff also noted that he had to stop working as a truck driver two or three days after starting because of the "physical demands of the job, and dealing with petroleum products all the time . . . ." (Tr. 33–34.)

Plaintiff reported that his QRC had assisted him with his job search in relation to his workers' compensation case. (Tr. 49.) Plaintiff stated that he was limited to sedentary type work because of his breathing problems. (Tr. 41.) Plaintiff testified that he knew how to use the computer, internet, and email and could type at a speed of 15 to 20 words per minute with accuracy. (Tr. 35–36.) Plaintiff commented that Ms. Thran recommended that he work from his home computer, but Plaintiff lacked a high-speed internet connection and printing ink caused respiratory problems for him. (Tr. 49.) As a result, Plaintiff stated, his conversations with Ms. Thran "always run into a roadblock with the environment." (Tr. 49.) Plaintiff noted he filed a

workers' compensation claim against his employer, Second Auto Repair Shop, which settled for $100,000. (Tr. 39.)

## 2. VE's Testimony

Kenneth E. Overland testified as a vocational expert (VE) at the ALJ hearing. (Tr. 51.) The ALJ posed five hypothetical questions to the VE relating to Plaintiff. The first question was whether a 30 to 34 year-old male could perform Plaintiff's past relevant jobs if he had a GED, a commercial driver's license, medical related training, knowledge of computers, reactive airway syndrome, infrequent headaches, chronic sinusitis, a deviated nasal septum, and a turbinate hypertrophy. (Tr. 52–53.) The VE testified that such a person could perform his past jobs. (Tr. 53.)

The ALJ then posed a second hypothetical question, adding the restrictions that the person could not be exposed to high concentrations of dust, fumes, gases, odors, perfumes, and solvents. (Tr. 53.) The VE testified that such an individual could not perform Plaintiff's past jobs. (Tr. 53.) The VE stated, however, that such an individual could transfer some of his skills as a mechanic and first responder to other jobs in the national economy. (Tr. 53–54.) For example, the VE stated that such a person could act as a referral or information aide. (DOT No. 237.367-042.) According to the VE, there were 3,600 referral or information aide jobs in the state of Minnesota. (Tr. 54.) The VE described this position as "a responder to electrical and gas problems." (Tr. 54.)   According to the VE, the responder does not get involved with gases or electrical problems and works in "pretty clean environments." (Tr. 54.)

As a third hypothetical question, the ALJ added the restriction that the individual could only do sedentary work, meaning, not lifting more than ten pounds and not being on his feet for

more than two hours during an eight hour workday. (Tr. 54.) The VE testified that such a person could still perform a referral or information aide job. (Tr. 54.)

The ALJ posed a fourth hypothetical question, adding the restriction that the individual would need a higher degree of protection from the environment, such as a clean room and use of mechanical devices to try to exclude perfumes and odors. (Tr. 54–55.) The VE testified that such a person could not perform a job as a referral aide, but could perform a job as a semi-conductor assembler (DOT No. 726.684-034), of which there are 1,200 jobs in the state of Minnesota. (Tr. 55.)

The last hypothetical question asked by the ALJ added the limitation that the individual could not be exposed to extreme temperatures. (Tr. 55.) The VE testified that such a person could still perform the semi-conductor assembler position. (Id.)

Plaintiff's attorney asked the VE whether the hypothetical person could perform the semi-conductor assembler job if the person was to avoid *all* exposure to cold, heat, humidity, fumes, odors, dust and gasses. (Tr. 57.) The VE testified that no jobs with those limitations would exist in the national economy based on the hypothetical individual's transferrable skills. (Tr. 57.)

## F. THE ALJ'S DECISION

The ALJ, Roger W. Thomas, noted that Plaintiff met the insured status requirements for entitlement to benefits from the alleged onset disability date through the date of decision. (Tr. 18.) The ALJ engaged in the required five-step sequential evaluation: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5)

whether the claimant could do other work existing in significant numbers in the regional or national economy. <u>See</u> 20 C.F.R. § 404.1520(a)–(f).

At step one, ALJ Thomas found Plaintiff had not engaged in substantial gainful activity since November 9, 2004, the onset date of his disability. (Tr. 18.) At step two, ALJ Thomas found that Plaintiff suffered from a severe impairment – RADS. (Tr. 18–20.) At the third step, ALJ Thomas concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20.) ALJ Thomas reached this conclusion because he found that there was no objective medical evidence of Plaintiff's respiratory impairment. (<u>Id.</u>) ALJ Thomas noted that all objective testing of Plaintiff had been normal. (<u>Id.</u>)

At step four, ALJ Thomas assessed Plaintiff's residual functional capacity (RFC), finding him capable of performing work at all exertion levels, but concluding that Plaintiff could not be exposed to high concentrations of dust, fumes, gases, odors, perfumes, or solvents. (<u>Id.</u>) First, ALJ Thomas detailed Plaintiff's testimony at the hearing. (<u>Id.</u> at 21.) ALJ Thomas recognized that the Plaintiff's life had been disrupted by RADS because he must shop at night to avoid harmful fumes used at stores. (<u>Id.</u>) ALJ Thomas noted, however, that despite Plaintiff's condition, he continued to smoke during a portion of the time under consideration, he took care of his personal hygiene needs independently, and he had no side effects from his medications. (<u>Id.</u>) ALJ Thomas also noted that the Plaintiff had recently settled a workmen's compensation claim for $100,000. (<u>Id.</u>)

Second, ALJ Thomas discussed the medical records from Plaintiff's primary treating physician, Dr. Douglass. (<u>Id.</u>) Dr. Douglass completed a RFC statement sent to him by Plaintiff's former attorney. (<u>Id.</u>) Dr. Douglass advised that Plaintiff was limited to a restricted range of

sedentary work. (Id.) ALJ Thomas stated, however, that he did not afford Dr. Douglass' opinion controlling weight because his judgment was not consistent with the objective medical evidence regarding Plaintiff's impairments or Plaintiff's functional ability, as noted in his reported daily activities. (Id.)

Third, the ALJ examined reports from the Plaintiff's QRC, Ms. Thran. (Id.)  Ms. Thran noted that the Plaintiff had difficulty going outside of his home, due to his respiratory problems, and that he required training to perform work that could be done from home. (Tr. 22.) Ms. Thran also opined that Plaintiff would likely be unable to perform an 8-hour workday and speculated that Plaintiff would have frequent absences from work due to his respiratory problems. (Id.) After considering Ms. Thran's opinions, ALJ Thomas stated that he did not give Ms. Thran's conclusions controlling weight because they were not based on objective medical evidence. However, after considering the above information and opinions, the ALJ found that Plaintiff could not return to his past relevant work due to his RADS diagnosis. (Id.)

At step five, ALJ Thomas found that although Plaintiff could not return to his past relevant work, Plaintiff could perform other work that existed in significant numbers in the national economy. (Id. at 22–23.) ALJ Thomas referred to the VE's testimony that Plaintiff's past relevant work experiences provided him with transferable work skills. (Id.) Further, ALJ Thomas noted that the VE testified that a hypothetical person of Plaintiff's age, education, work experience, and RFC could work as a referral and information aide (DOT no. 237.367-042) and that 3,600 referral and information aide jobs existed in the State of Minnesota. (Id. at 23, 53–54.) Accordingly, because Plaintiff retained the RFC to perform jobs in the regional economy, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Id.)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). A person is disabled if his physical or mental condition renders that person unable to do not only his previous work, but also other any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d). The impairment must last for a continuous period of not less than twelve months or be expected to result in death. Id.

### A.    ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he may request a reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. Id. at § 404.929. The ALJ must follow a five-step analysis in determining whether a claimant is disabled: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, subpt. P, app.1; (4) whether the claimant was capable of returning to past relevant work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. See 20 C.F.R. § 404.1520(a)–(f); see also Bowen v. Yuckert, 710 F.2d 1334, 1337 (8th Cir. 1983). Once the claimant demonstrates his impairments prevent him from performing his previous work, the burden shifts to the Commissioner to prove that jobs exist in the national economy that the claimant could perform. O'Leary v. Schweiker, 710 F.2d 1334, 1337 (8th Cir. 1983).

If the claimant is dissatisfied with the ALJ's decision, he may request review by the Appeals Council, although review is not automatic. Id. §§ 404.967–.982. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeal Council's action. 42 U.S.C. §§ 405(g); 1383(c)(3); 20 C.F.R. § 404.981.

## B. JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748–49 (8th Cir. 1989). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review and consider:

1. The credibility findings made by the ALJ;
2. The plaintiff's vocational factors;
3. The medical evidence from treating and consulting physicians;
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5. Any corroboration by third parties of the plaintiff's impairments; and
6. The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183, 1184–85 (8th Cir. 1989)). A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion. Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). In reviewing the record for substantial evidence, the court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.  DISCUSSION

Plaintiff alleges two errors in the ALJ's evaluation of his DIB claim. First, Plaintiff argues that substantial evidence does not support the ALJ's RFC assessment because the assessment did not include the limitations imposed by Plaintiff's treating physician, Dr. Douglass. Second, Plaintiff contends that the ALJ's conclusion that Plaintiff could perform relevant work was based on a hypothetical question to a VE that did not "comprehensively describe" his limitations. (Pl. Br. 11–15). This Court concludes that the ALJ did not err in discounting Dr. Douglass's opinions or in relying on the testimony of the VE. Because the ALJ's hypothetical question, comprehensive analysis, and opinion are supported by substantial evidence, this Court recommends that Plaintiff's motion be denied and that Defendant's motion be granted.

## A.     RESIDUAL FUNCTIONAL CAPACITY

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence. Casey v. Astrue, 503 F.3d 687, 696–97 (8th Cir. 2007). A claimant's RFC is the most he is able to do despite the limitations caused by his impairments. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). The ALJ must determine a Plaintiff's RFC based on all relevant evidence, including various physicians' opinions and the credibility of Plaintiff's subjective complaints. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007); Masterson v. Barnhart, 363 F.3d 731, 737–38 (8th Cir. 2004). In addition, the ALJ need not give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

### 1.     Treating Physician's Opinion

Plaintiff first argues the ALJ did not properly consider the medical evidence from his treating physician, Dr. Douglass, in determining his RFC. When a case involves medical opinions—defined as "statements from physicians and psychologists or other acceptable medical sources"—the opinion of a treating physician must be afforded substantial weight. See 20 C.F.R. §§ 404.1527; 416.927; see also Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir.2008). The ALJ must use the framework described in 20 C.F.R. § 404.1527(d) to determine the proper weight to give a treating physician's medical opinions. Under the regulations, the ALJ should consider the following factors in making the determination: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is a specialist. 20 C.F.R. § 404.1527(d).

But a physician's opinion is not necessarily conclusive. See Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir.2004). The ALJ may discount a treating physician's medical opinion, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir.1997). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); see also SSR 96-2p.

Moreover, the determination of whether a claimant can perform sedentary work is a question reserved for a vocational expert, not a medical source. See Coleman v. Astrue, 498 F.3d 767, 770–71 (8th Cir. 2007) (citing Medical Source Opinions on Issues Reserved to the Commissioner, Soc. Sec. Rul. (hereinafter SSR) 96-5p (July 2, 1996), 1996 WL 374183, at *5) ("Adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms.").[2]

According to Dr. Douglass, Plaintiff was limited to sedentary work and needed to avoid exposure to respiratory irritants. The ALJ did not give Dr. Douglass's opinions controlling weight, finding that they were not consistent with and were not supported by objective evidence. Instead, the ALJ concluded that Plaintiff could perform work at all exertion levels, as long as he avoided exposure to high concentrations of dusts, fumes, gases, odors, perfumes, or solvents. Plaintiff alleges several errors in the weight the ALJ gave to the medical opinions in this case.

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Plaintiff contends that the ALJ improperly discounted Dr. Douglass's opinion by finding that Plaintiff's medical records did not generally support Dr. Douglas's diagnosis. Because the ALJ rejected Dr. Douglass's opinion, and did not rely on any other physician's medical opinion in coming to his conclusion, Plaintiff contends the ALJ erred by substituting his own lay opinion with regard to Plaintiff's RFC. In addition, Plaintiff contends that the ALJ erred by not considering Dr. Douglass's opinion that Plaintiff's RFC be limited to sedentary work with no exposure to any respiratory irritants. Last, Plaintiff argues that his treating physician's opinions are supported by objective findings in the record. Defendant disagrees, asserting that the ALJ reasonably discounted Dr. Douglass's opinion in his RFC assessment.

First, the ALJ did not wholly discount the medical opinions of Dr. Douglass in determining Plaintiff's RFC. Indeed, after weighing the evidence in the record as a whole, the ALJ included a restriction that Plaintiff could not be exposed to high concentrations of dust, fumes, gases, odors, perfumes, or solvent. The inclusion of this limitation in the ALJ's RFC determination shows that he gave some credit to Dr. Douglass's opinions. The ALJ refused, however, to accept Dr. Douglass's conclusion that Plaintiff was limited to sedentary work and needed to avoid all exposure to fumes, odors, vapors, perfumes, or other respiratory irritants.

Moreover, the ALJ properly explained his bases for discounting Dr. Douglass's conclusion that Plaintiff was unable to work. First, the ALJ noted "no indication of objective tests supporting these extreme limitations." See Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to medical evidence as a whole, the ALJ can accord it less weight.") Second, the ALJ also noted that Plaintiff's own reported activities, such as household chores, cooking, and grocery shopping as well as his decision to continue smoking months after his respiratory symptoms surfaced, were inconsistent with Dr.

Douglass's opinion. See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

The ALJ's conclusion is also supported by substantial evidence in the record. First, no objective evidence supports Dr. Douglass's opinion that Plaintiff must be restricted to sedentary work and avoid *all* exposure to respiratory irritants. Contrary to the extreme limitations assessed by Dr. Douglass, Plaintiff underwent countless medical examinations testing his respiratory condition including an EKG, diffusion capacity and lung volume tests, pulmonary function exams, a dobutamine stress echocardiogram, a heterophile mono screen, a thyroid-stimulating hormone test, chest x-rays, a treadmill examination, a comprehensive biochemical profile, a heart catheterization, and a CT scan of his chest, among others. Each of these tests revealed no objective abnormalities. Further, the record contains multiple statements made by Dr. Douglass and other consulting physicians recognizing that Plaintiff's reported symptoms are not supported by objective medical evidence.

The only objective evidence supporting Dr. Douglass's opinion is a methacholine challenge test and an FCE examination. A methacholine challenge test administered by a doctor at the Mayo Clinic was cited by Dr. Douglass as "borderline positive." The Mayo Clinic doctor who administered the test, however, noted that the examination produced "technically negative" results with normal baseline spirometry and oximetry. Plaintiff also had an FCE examination finding that he must be limited to sedentary work. But just two months after the FCE examination, Plaintiff reported to Dr. Douglass that he felt almost back to normal. These examinations, combined with countless other normal medical results, lead this Court to conclude that the ALJ reasonably discounted Dr. Douglass's opinion.

Second, Dr. Douglass's opinion is inconsistent with Plaintiff's daily activities. Despite Dr. Douglass's opinion that Plaintiff must avoid all respiratory irritants, Plaintiff continued to smoke for months after his exposure to paint and clear coat. Further, after Plaintiff quit smoking, he noted that being around cigarette smoke did not trigger breathing difficulties. Plaintiff was able to walk nearly every day, ranging from one mile to two and a half miles at a time. Plaintiff also reported that he was able to hunt, which included walking up to one mile and helping another individual with a deer. Plaintiff continuously searched for jobs, expressing concern about whether he would find a job that "he has an inclination to do" or "that will earn more money than minimum wage and help support his family." (Tr. 297–98). Plaintiff frequently went to the mall and grocery store, although he went late at night to avoid people and cleaning products. Plaintiff was able to attend doctor appointments on a weekly and monthly basis, exposing himself to moderate respiratory irritants at the office. This evidence demonstrates that (1) Plaintiff can perform work at a higher level than sedentary and (2) Plaintiff is not harmed by exposure to a moderate level of respiratory irritants.

Under the circumstances, the ALJ reasonably discounted Dr. Douglass's opinion that Plaintiff be limited to sedentary work and have no exposure to respiratory irritants. His opinion was not supported by objective medical evidence. Additionally, the ALJ reasonably concluded that Plaintiff's daily activities demonstrated he was not as limited as Dr. Douglass concluded. Accordingly, the Court will not disturb the ALJ's RFC determination because it is supported by substantial evidence.

### 2. Recontacting Plaintiff's Treating Physician

Plaintiff argues, in the alternative, that even if the treating physician's opinions were inconsistent, the ALJ was required to contact Dr. Douglass to clarify his opinions. While the

regulations provide that the ALJ should recontact a treating physician in some circumstances, that requirement is not universal. 20 C.F.R. § 404.1512(e). The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled. Id. The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable. See Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir.2004). This is especially true when the ALJ is able to determine from the record whether the applicant is disabled. Id. While the ALJ has an independent duty to develop the record on a social security disability hearing, the ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

The ALJ did not err by failing to contact Dr. Douglass for clarification of his opinions before discounting them. The ALJ discounted Dr. Douglass's opinions because they were inconsistent with other evidence in the record and under such circumstances, the regulations do not require the ALJ to recontact the physician. Additionally, the ALJ did not find the doctor's records inadequate, unclear, or incomplete, nor did he find the doctor used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinions because they were inconsistent with objective and other substantial evidence. Accordingly, the ALJ was under no obligation to recontact the treating physician under such circumstances.

### B. HYPOTHETICAL QUESTION

Plaintiff argues that, because the ALJ improperly assessed Plaintiff's RFC, the ALJ's hypothetical question was improper. A hypothetical question posed to a VE is sufficient if it "sets forth impairments supported by substantial evidence in the record and accepted as true." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). A proper hypothetical question presents to

the VE a set of limitations that mirror those of the claimant. <u>Harwood v. Apfel</u>, 186 F.3d 1039, 1044 (8th Cir.1999). An ALJ need not accept every limitation posed by a physician as true. <u>See Pearsall v. Massanari</u>, 274 F.3d 1211, 1220 (8th Cir. 2001) ("The ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit."). Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence. <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

Plaintiff contends that the ALJ's hypothetical questions were flawed, based upon his general contention that the ALJ improperly determined his RFC. Plaintiff fails to identify any specific deficiencies in the ALJ's formulation of the RFC. Rather, Plaintiff states generally that the facts adopted by the ALJ cannot serve as substantial evidence in support of a finding of no disability because the ALJ did not include all of Plaintiff's limitations identified by Dr. Douglass. It appears that Plaintiff's complaint is that the hypothetical posed by the ALJ did not include Dr. Douglass's determination that Plaintiff could only perform work at the sedentary level and needed to avoid all respiratory irritants.

Plaintiff's argument fails on two grounds. First, Plaintiff's argument rests on his belief that the ALJ should have given controlling weight to Dr. Douglas's opinions that Plaintiff must avoid all respiratory irritants and that, accordingly, the hypothetical should have incorporated this limitation. As set forth above, the ALJ's rejection of this limitation is supported by substantial evidence, and a proper hypothetical question need only include those impairments and limitations found credible by the ALJ. The hypothetical question posed by the ALJ properly reflected the impairments that the ALJ found to be supported by the record; the ALJ was not required to include impairments not so supported.

Second, the ALJ included the limitation that the individual be restricted to sedentary work in his hypothetical question to the VE. In response, the VE identified a range of work available in substantial numbers in the national economy that Plaintiff could perform given this limitation. Additionally, the jobs that the VE determined Plaintiff could perform (i.e., a referral and information aide or a semi-conductor assembler) are both classified as sedentary by the U.S. Department of Labor Dictionary of Occupational Titles (DOT), no. 208.658–010 (4th ed. 1991). Therefore, the ALJ's finding that the Plaintiff was not disabled because he was capable of performing work which existed in the national economy, was supported by substantial evidence in the record as a whole.

**RECOMMENDATION**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 13), be **DENIED**; and

2. Defendant's Motion for Summary Judgment (Doc. No. 16), be **GRANTED**;

Dated:  June 14, 2010                                        _s/ Susan Richard Nelson_____
                                                            SUSAN RICHARD NELSON
                                                            United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 29, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.